**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **NATIONAL MEDICAL IMAGING, LLC,** *et al.*, | : |
| **Plaintiffs,** | : |
| v. | : |
| | : |
| | : |
| **U.S. BANK, N.A.,** *et al.*, | : |
| **Defendants.** | : |

: **CIVIL ACTION NO.**
: **16-5044**

## MEMORANDUM OPINION

**Rufe, J.**                                                                                    **August 28, 2019**

This case is one chapter in the protracted litigation following the aftermath of a complex

securitization transaction, and the Court writes primarily for the parties, who are familiar with

the background. Plaintiffs National Medical Imaging, LLC and National Medical Imaging

Holding Company, LLC (collectively "NMI") allege that Defendants[1] filed involuntary

bankruptcy petitions against them in bad faith in violation of 11 U.S.C. § 303. Defendants have

filed motions for summary judgment, and for the reasons that follow, these motions will be

granted.

## I.     BACKGROUND[2]

NMI was a diagnostic imaging company headquartered in Philadelphia that provided

management, billing, and collection services for diagnostic imaging centers. NMI was affiliated

with certain limited partnerships (the "NMI LPs") that operated diagnostic imaging centers. In

---

[1] Defendants are: (1) U.S. Bank, N.A., (2) Lyon Financial Services, Inc. (doing business as U.S. Bank Portfolio Services), (3) DVI Receivables XIV, LLC, (4) DVI Receivables XVI, LLC, (5) DVI Receivables XVII, LLC, (6) DVI Receivables XVIII, LLC, (7) DVI Receivables XIX, LLC, (8) DVI Funding, LLC, (9) Ashland Funding, LLC, and (10) Jane Fox.

[2] Unless otherwise noted, the following facts are undisputed. The following background is drawn primarily from the Court's Memoranda issued on July 12, 2017 [Doc. No. 13], and April 30, 2018 [Doc. No. 49].

2000, the NMI LPs entered into various master leases and equipment schedules ("Master Leases") with DVI Financial Services to finance the purchase of equipment for use at the centers. These Master Leases were secured by a limited guaranty executed by Maury Rosenberg, the managing member of NMI, and an additional guaranty by NMI.

DVI Financial then transferred some of the Master Leases to DVI Funding, LLC, which held them directly, and the remainder were securitized and assigned to the DVI Receivables corporations. At the same time, DVI Funding entered into indentures with U.S. Bank, acting as trustee of the transaction, under which notes were issued to investors with the Master Leases serving as collateral. DVI Financial was appointed as servicer for the trustee, U.S. Bank, but after filing for bankruptcy in 2003, DVI Financial transferred its rights as servicer to Lyon Financial Services, a subsidiary of U.S. Bank.[3]

In 2003, U.S. Bank declared the Master Leases to be in default and filed multiple suits in the Court of Common Pleas of Bucks County, Pennsylvania, against NMI. While those actions were pending, several DVI entities filed involuntary bankruptcy petitions against NMI, that resulted in a Settlement Agreement in August of 2005, by which the petitions were dismissed and U.S. Bank restructured the repayment obligations; in return, Rosenberg and NMI executed new guaranties of repayment and confessions of judgment in favor of U.S. Bank. On March 2, 2007, DVI Funding sold its interest in the Master Leases to Ashland Funding, LLC.

In July 2008, U.S. Bank filed a confession of judgment against NMI and Rosenberg in Bucks County for defaulting on their repayment obligations under the August 2005 Settlement

---

[3] At the relevant time, Lyon was a subsidiary of U.S. Bank, and controlled the DVI entities. In 2011, Lyon merged with U.S. Bank, with U.S. Bank as the surviving company. For clarity, the Court will refer to all conduct of U.S. Bank and Lyon as conduct of U.S. Bank.

Agreement. This action was stayed on August 29, 2008,[4] and on November 7, 2008, despite having no remaining interest in the Master Leases, DVI Funding and five other DVI entities filed involuntary bankruptcy petitions against NMI and Rosenberg in the United States Bankruptcy Court for the Eastern District of Pennsylvania.

The proceedings against Maury Rosenberg were ultimately transferred to the Southern District of Florida, where he resides, while the bankruptcy proceedings against NMI remained in this district.[5] The Florida Bankruptcy Court dismissed the involuntary bankruptcy petition against Rosenberg on August 21, 2009 (*Rosenberg I*),[6] a decision which was affirmed by both the United States District Court Southern District of Florida and the Eleventh Circuit.

Following the dismissal of the bankruptcy proceedings in Florida, the Bankruptcy Court for the Eastern District of Pennsylvania dismissed the involuntary bankruptcy petitions against NMI on the basis of collateral estoppel; specifically, based on *Rosenberg I*'s holdings that (1) the DVI entities and Ashland were not real parties in interest and (2) U.S. Bank was the only creditor because the Settlement Agreement constituted a novation.[7] The decision was affirmed by both this Court ("*Rosenberg II*")[8] as well as the Third Circuit ("*Rosenberg III*").[9]

---

[4] Order Staying Execution of Confessions of Judgment, Ex. 25 [Doc. No. 85-4].

[5] The Florida Bankruptcy Court also retained jurisdiction to hear any claim pursuant to 11 U.S.C. § 303(i) for the bad faith filing of an involuntary bankruptcy petition.

[6] *In re Rosenberg*, 414 B.R. 826 (Bankr. S.D. Fla. 2009). The Florida Bankruptcy Court reached five alternative holdings: (1) there was no guaranty in favor of the DVI entities or Ashland, and therefore they were not creditors of Rosenberg; (2) the DVI entities and Ashland were not the real parties in interest; (3) the DVI entities were judicially estopped from filing the involuntary bankruptcy petitions because Lyon had claimed that the Rosenberg guaranty was owed to it when filing the confession of judgment in the Bucks County court; (4) Lyon was Rosenberg's only creditor because the Settlement Agreement constituted a novation; and (5) the DVI entities and Ashland held contingent claims subject to a *bona fide* dispute. *Id.*

[7] *In re Nat'l Medical Imaging, LLC*, 439 B.R. 837, 847-52 (Bankr. E.D. Pa. 2009).

[8] *DVI Receivables XIV, LLC v. Nat'l Med. Imaging, LLC*, 529 B.R. 607, 627 (Bankr. E.D. Pa. 2015).

[9] *Nat'l Med. Imaging, LLC v. Ashland Funding LLC*, 648 F. App'x 251, 252–53 (3d Cir. 2016).

Prior to the filing of the November 2008, involuntary bankruptcy petitions against it, NMI was experiencing financial difficulties that it claimed were due in part to the Deficit Reduction Act ("DRA"), which impacted the billing of medical imaging services.[10] In light of these difficulties, NMI began discussions with U.S. Bank in 2008, in an effort to restructure its outstanding debt. The parties have offered conflicting characterizations of their unsuccessful attempts to negotiate such an agreement. NMI contends that U.S. Bank "had no interest in negotiating a restructuring of NMI's debt or working with NMI to find a realistic solution,"[11] while Defendants assert that U.S. Bank "engaged in a dialogue with NMI for several months. But NMI refused to provide center-by-center financials, made exceedingly low offers … and, when those offers were not accepted, chose the nuclear option—closing the centers."[12]

In October 2008, Rosenberg decided to close NMI's Maryland and Illinois locations, and notified Jane Fox, who was then the Director of Operations for a subsidiary of U.S. Bank, that NMI would surrender the equipment leased from U.S. Bank located in the Pennsylvania imaging centers.[13] By November of 2009, NMI closed all of its locations and effectively became defunct. The parties disagree as to whether the involuntary bankruptcy petitions were a proximate cause of the business's ultimate demise.

NMI, Maury Rosenberg, and various related entities have filed a series of lawsuits in this Court and in Florida, seeking compensation for the harm they allege to have suffered as a result of the involuntary bankruptcy petitions purportedly filed in bad faith. Maury Rosenberg brought one such claim for sanctions under § 303(i)(2) in the Florida Bankruptcy Court against the

---

[10] *See* Pls.' Omnibus Mem. in Opp. Summ. J. [Doc. No. 85] at 5.

[11] Pls.' Omnibus Mem. in Opp. Summ. J. [Doc. No 85] at 7.

[12] Defs.' Omnibus Reply in Supp. Summ. J. [Doc. No. 90] at 8.

[13] October 6, 2008 Letter from Maury Rosenberg to Jane Fox, Ex. 33 [Doc. No. 85-4].

petitioners of the involuntary bankruptcy petitions. A jury trial was ultimately held on these claims, resulting in a verdict in favor of Maury Rosenberg.[14] Additionally, Sara Rosenberg, the Douglas Rosenberg Trust, and other entities related to Maury Rosenberg and NMI filed suit for tortious interference with contract and business relationships against the petitioners, based on the same facts, in the Southern District of Florida, which was transferred to this Court.[15]

In this case brought under § 303(i)(2),[16] NMI seeks compensatory and punitive damages for the alleged harm to NMI arising from the involuntary bankruptcy petitions. NMI contends that Defendants filed the petitions in bad faith and as a result:

> [T]he Plaintiffs' valuable businesses were destroyed because, among other reasons, the commencement and continued prosecution of the involuntary bankruptcy cases: (1) caused Plaintiffs to lose preferred provider status with major insurers; (2) caused physicians to lose confidence in the Plaintiffs' stability and to divert their patients to other providers; (3) caused lenders to cutoff the Plaintiffs' access to receivables, thereby creating a liquidity crisis; (4) caused vendors to put the companies on a COD basis, thereby further eroding cash and liquidity; and (5) destroyed Plaintiffs' reputations in the community, and torpedoed planned acquisitions and expansion.[17]

---

[14] The District Court of the Southern District of Florida set aside the award of compensatory damages for lost wages and injury to reputation, "because the evidence d[id] not establish the involuntary bankruptcy proximately caused Plaintiff to lose wages or injure his reputation," and also set aside the award of punitive damages. *Rosenberg v. DVI Receivables, XIV, LLC*, No. 12–22275, 2014 WL 4810348, at *1 (S.D. Fla. 2014). This decision was vacated by the Eleventh Circuit, however, as the underlying Rule 50 motion was deemed untimely. *Rosenberg v. DVI Receivables XIV, LLC*, 818 F.3d 1283 (11th Cir. 2016).

[15] Civil Action No. 14-5608. Summary judgment motions have also been filed in that case.

[16] On May 27, 2014, Plaintiffs brought claims for attorneys' fees and costs under § 303(i)(1) and Bankruptcy Rule 9011 in two adversary proceedings in the Pennsylvania Bankruptcy Court. Plaintiffs also filed a complaint in this Court against Defendants seeking damages under § 303(i)(2). On March 30, 2014, this Court granted Defendants' Motion to Dismiss Plaintiffs' Complaint, holding that § 303(i)(2) does not create an independent cause of action that may be brought directly in the district court. Plaintiffs then filed Amended Complaints in the adversary proceedings, adding claims for damages under § 303(i)(2), and moved to withdraw the references from the Pennsylvania Bankruptcy Court as to the § 303(i)(2) claims. The Court granted Plaintiffs' motion on September 1, 2016.

NMI filed the operative Amended Complaint on September 21, 2016, in accordance with the Order of this Court granting NMI's request to withdraw the reference form the Bankruptcy Court.

[17] Am. Compl. [Doc. No. 2] ¶ 72.

All Defendants have now moved for summary judgment on NMI's claim under § 303(i)(2). Defendant U.S. Bank has also moved for default judgment on its counterclaim, in which it seeks to setoff the amount due to it under a state court judgment it obtained against Plaintiffs in Bucks County, either in full or partial satisfaction of any judgment NMI obtains in this action.[18]

## II.     LEGAL STANDARD

A court will award summary judgment on a claim or part of a claim where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[19] A fact is "material" if resolving the dispute over the fact "might affect the outcome of the suit under the governing [substantive] law."[20] A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[21]

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.[22] Further, a court may not weigh the evidence or make credibility determinations.[23] Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[24] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[25] This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it

---

[18] Countercl. [Doc. No. 5] ¶¶ 9-11.

[19] Fed. R. Civ. P. 56(a).

[20] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[21] *Id.*

[22] *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

[23] *Boyle v. Cty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998).

[24] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[25] *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

is unnecessary and would only cause delay and expense."[26]  Therefore, if, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine dispute as to any material fact, summary judgment is appropriate.[27]

## III.  DISCUSSION

Where an involuntary bankruptcy petition is dismissed other than on consent of all petitioners and the debtor, a court may grant judgment "against any petitioner that filed the petition in bad faith, for — (A) any damages proximately caused by such filing; or (B) punitive damages."[28] In moving for summary judgment, Defendants contend that there is no genuine issue of material fact concerning bad faith, causation, or punitive damages.

As discussed below, the record makes clear that neither compensatory damages nor punitive damages are warranted in this case. Specifically, the record establishes that NMI's financial difficulties were caused by factors independent of the involuntary bankruptcy petitions, and thus there is no genuine dispute of material fact on the issue of proximate cause. There are limited indicia of bad faith, which preclude any determination on that issue as a matter of law, such as insufficient pre-filing investigation into the facts and law. Yet, the evidence relating to bad faith does not rise to a level that would merit punitive damages, especially considering NMI's severe financial distress.

### 1.  Compensatory Damages

Where a petitioner files an involuntary bankruptcy petition in bad faith, the debtor can recover for "any damages proximately caused by such filing."[29] Such damages may not be based

---

[26] *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir. 1976)).

[27] *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

[28] 11 U.S.C. § 303(i)(2).

[29] 11 U.S.C. § 303(i)(2)(A).

on speculation or mere conjecture.[30] In this case, Defendants argue that any purported injuries caused by the involuntary petitions are purely speculative, especially in light of NMI's "dire financial straits,"[31] and as NMI was closing its centers before the involuntary petitions were even filed. The Court agrees.

NMI concedes that it had been suffering losses prior to the involuntary bankruptcy petitions due to the DRA,[32] and evidence in the record sheds light on the severity of its losses. In a letter NMI sent to U.S. Bank, NMI asserted that the DRA resulted in a "significant reduction" in reimbursements, reductions in the number of patients that could be seen in outpatient centers, a decline of about 16% in total scan volume from 2005 to 2007, an overall company volume decline of about 19% when comparing January 2007 to January 2008, and a "severe reduction in cash collections."[33] These changes "brought about disastrous results" for NMI.[34] According to Plaintiffs, Maury Rosenberg closed all of the NMI's Maryland and Illinois centers in October of 2008, "as a cost-cutting measure."[35]

The record also includes substantial evidence that, in the face of the obstacles posed by the DRA and before the involuntary bankruptcy petitions were filed, Rosenberg had decided to close all of the NMI centers. As early as April 9, 2008, Rosenberg wrote in an email that "[m]ost outpatient centers are in the process of closing their doors and it is my opinion that in the very near term will stop to exist," and NMI's efforts to cut costs "are not sufficient for [NMI] to

---

[30] *Archer v. Macomb Cty. Bank*, 853 F.2d 497, 499 (6th Cir. 1988).

[31] *See* U.S. Bank's Mot. Summ. J. [Doc. No. 78] at 5.

[32] *See* Pls.' Omnibus Mem. in Opp. Summ. J. [Doc. No. 85] at 9.

[33] April 7, 2008 Letter [Doc. No. 78-7] at 1-4.

[34] *Id.* at 3.

[35] Pls.' Omnibus Mem. in Opp. Summ. J. [Doc. No. 85] at 9.

survive" in the face of the "draconian changes brought about by the DRA."[36] In this email, Rosenberg blamed "the nonprofit and government authorities" for this financial hardship.[37] Rosenberg also expressed his intention to close NMI in numerous pre-petition emails to U.S. Bank representatives. Jane Fox asserts that Maury Rosenberg informed her that he was closing imaging centers in October 2008.[38] On November 3, 2008, Rosenberg, apparently referencing a prior conversation concerning the closing of all NMI centers, wrote to Bob Brier, U.S. Bank's business consultant at the time, that "*as previously discussed*, we are in the process of closing all of the centers [and] this process should be completed no later than 12/15/08."[39] That same day, Maury Rosenberg told a potential purchaser that NMI "expects to close all of the [Pennsylvania] centers prior to Mid-December and is in the process of negotiating real estate lease terminations and will tender the equipment back to the secured lenders."[40] A few days later, on November 6, 2008, Rosenberg urged Brier to begin picking up equipment at the Pennsylvania sites because various landlords were calling.[41]

Rosenberg now disputes the veracity of his own statements to Brier and to a potential purchaser, and contends that he made them only out of frustration.[42] He asserts that he intended to keep open several NMI centers, and in support, points to his communications with Sterling

---

[36] April 9, 2008 Email from Maury Rosenberg, [Doc. No. 78-25] at 2.

[37] *Id.*

[38] Jane Fox Dep. [Doc. No. 78-8] at 351 (emphasis added). Fox asserted that, at the time of the filing her understanding was that "all of the operations were going to close down," and she was "told by Mr. Rosenberg at [her] deposition in October [2008] that they were closing down imaging centers." *Id.* at 350-51.

[39] Email Nov. 3, 2008, A-11 [Doc. No. 78-12].

[40] November 3, 2008 Email from Maury Rosenberg to Mary Ellen Garling [Doc. No. 78-14].

[41] November 6, 2008 email from Maury Rosenberg to Brier [Doc. No. 78-13].

[42] "It was reasonable for Rosenberg to be frustrated and hesitant to engage in discussions with another potential buyer when the exercise appeared to be futile in resolving NMI's dispute with U.S. Bank," and, "[g]iven this backdrop, a jury could reasonably infer that Rosenberg made his 'closing all centers' comment, which was related only to the U.S. Bank locations (not the whole business itself), out of frustration and that it was not, in fact, the true intention of NMI at that time." Pls.' Omnibus Mem. Opp. Summ. J. [Doc. No. 85] at 37.

National Bank (with which NMI had obtained a line of credit) in which he asserted his intention to keep four to five centers open once the involuntary petition was dismissed.[43] These statements were made after the involuntary petitions were filed, and inconsistencies in Maury Rosenberg's representations to interested parties do not give rise to a genuine dispute of material fact.

In addition to the evidence that Rosenberg intended to close down NMI's business before the involuntary bankruptcy petitions were filed, the specific injuries that Plaintiffs complain of are not supported by the record.

### 1. *Purported Loss of Preferred Provider Status and Physicians' Confidence in NMI*

First, NMI alleges that it lost "preferred provider status" and the confidence of referring physicians as a result of the involuntary bankruptcy petitions. Initially, it is not clear that "preferred provider status" even exists in the sense that NMI alleges. According to Ann Marie Iannarelli, NMI's Senior Vice President of Operations, "preferred provider status" is a means by which insurance companies can recommend where a patient should go, and NMI was "at the top of the list if not number one most of the time" based on the "service and quality of work," but they got "pushed down on the provider list from number one to midstream" after the involuntary bankruptcy petitions were filed.[44] However, Defendants' expert, David Levin, M.D., has asserted that "there is no such thing as 'preferred' provider status with the insurers. You either have a contract with the insurer to be part of their approved network or you don't. Once you're approved there is no list of providers who are 'preferred' on the basis of their financial status."[45]

---

[43] Sterling Bank Memo, March 30, 2009, Ex. 61 [Doc. No. 85-6] at 55 ("Once the bankruptcy case is resolved they [sic] company plans on closing down most of their centers and keeping around 4 or 5 open. These centers are their most profitable centers. The company should then be self-sufficient with no financing requirements anticipated.").

[44] Iannarelli Dep. [Doc. No. 75-11] at 23, 50-52. Iannarelli admits that these insurance companies were not a source of referrals, but these "preferred provider lists" would be used where a patient wanted to see who their insurance company recommended. *Id.* at 23-24.

[45] Expert Report of David C. Levin, M.D. [Doc. No. 78-16] at 18.

NMI has not offered evidence or further explanation as to whether companies are essentially rated on these preferred provider listings.[46]

Additionally, NMI does not offer any statements from physicians to show that they lost confidence in NMI as a result of the involuntary bankruptcy petitions or that they were even aware of the petitions. In fact, Maury Rosenberg admitted that he did not have anything in writing that indicates that any insurance company dropped NMI as a preferred provider because of the involuntary petition.[47] Plaintiffs instead rely on statements of Iannarelli, who testified that it was her belief that physicians stopped referring patients to NMI for fear that it might go out of business and patients would be unable to get their medical records.[48] Yet, Iannarelli admitted that she did not personally discuss the bankruptcy with any of the referring physicians, and based her testimony on this subject on "hubbub talk."[49] Iannarelli's belief that NMI's reputation deteriorated in the eyes of physicians, as well as her belief that such purported harm was due to the involuntary petitions, as opposed to the financial difficulties NMI was already facing, is too biased and speculative to preclude summary judgment.

2. *Loss of Accounts Receivable to Sterling National Bank*

Rosenberg's allegation that the involuntary bankruptcy petition "irreparably fractured" NMI's relationship with Sterling National Bank ("Sterling") and caused it to lose its receivables

---

[46] While Plaintiffs expert, John Mitchell, mentioned the loss of "preferred provider listings" as an injury caused by the involuntary petitions, he does not elaborate on its meaning and cites only to the depositions of Maury Rosenberg and Iannarelli for support. Report on Economic Damages, Ex. 73 [Doc. No. 85-8] at 18. Iannarelli herself admits that she did not have any discussions with anybody at Aetna about the Preferred Provider List. Iannarelli Dep. [Doc. No. 75-11] at 57.

[47] Maury Rosenberg Dep., Ex. 70 [Doc. No. 85-7] at 322-25.

[48] Iannarelli Dep. [Doc. No. 75-11] at 26 ("we had lost some of our stability in the field because [the referring physicians] all knew about the involuntary as well. And we were perceived as not being, maybe not there tomorrow. So we were not getting directly from the referring physicians as we used to…").

[49] *Id.* at 26-27.

to Sterling is also unsupported by the record. As background, NMI had obtained a line of credit and a term loan from Sterling in 2007, secured by a lien on NMI's accounts receivable. Plaintiffs allege that Sterling found out about the involuntary bankruptcy in March 2009 from a Dunn and Bradstreet search, and issued a letter of default to NMI, citing the involuntary bankruptcy as the first reason for default. According to Plaintiffs, this default ultimately resulted in a forbearance agreement which NMI violated, thus resulting in the loss of the accounts receivable.

However, the record establishes that NMI was already in default of its loan from Sterling based on NMI's failure to comply with the covenants in their Loan and Security Agreement; namely, violations of the required debt to tangible net worth ratio covenant, the tangible net worth covenant, and the EBITDA covenant.[50] Sterling sent NMI a default letter explaining these violations on August 21, 2008.

In September 2008, Maury Rosenberg had a meeting with two representatives from Sterling to discuss NMI's large daily overdrafts, many of which ranged from $500,000 to $800,000, and "were the result of checks written to the [Douglas Rosenberg] Trust to cover deposits the Trust made on behalf of NMI the day before."[51] Additionally, Maury Rosenberg told Sterling that he did not have any additional collateral and that the Trust (which owned 99% of NMI) would not provide a guaranty.[52] Sterling informed Maury Rosenberg that NMI would have to "find another source of financing," Sterling was unwilling to consider his request for a higher line of credit, and Sterling "wanted the loan to come down in an orderly fashion."[53] Sterling's former Senior Vice President, Joseph Costanza, asserted that Sterling was "looking to exit its

---

[50] August 21, 2008 Default Letter [Doc. No. 78-17].

[51] October 6, 2008 Memo [Doc. No. 78-18] at 1-2.

[52] *Id.*

[53] *Id.*

relationship with NMI," prior to October of 2008, and that Maury Rosenberg was informed of this intention at the September 2008 meeting.[54]

Furthermore, the events that followed Sterling's discovery of the involuntary bankruptcy petition, including the creation and subsequent violation of the forbearance agreement, were not driven by the involuntary petitions as Plaintiffs suggest. While Plaintiffs are correct that the second default letter dated March 25, 2009, referenced the involuntary bankruptcy petitions, this letter also noted that NMI failed to notify Sterling about the involuntary bankruptcy petition as required, and that NMI failed to cure the violations listed in the prior default letter from August 21, 2008.[55] Additionally, the evidence shows that NMI breached the forbearance agreement by diverting funds to a non-permitted account at another bank, and by repaying the subordinated Trust debt ahead of Sterling.[56] Plaintiffs have not produced sufficient evidence from which a reasonable jury could conclude that Sterling would not have made the decision it did in the absence of the involuntary bankruptcy petition.

### 3. Allegation of Inability to Obtain Additional Credit

Finally, Plaintiffs' claim that the involuntary bankruptcy petitions caused NMI to lose access to credit lines lacks support in the record. In an April 7, 2008 letter, NMI's counsel wrote that, "[g]iven the state of the industry and the liquidity markets, NMI does not expect additional sources of funding will be available in 2008."[57] In an April 9, 2008 email, Maury Rosenberg reiterated this comment, and also noted that NMI "does not have the cash flow, or access to

---

[54] Joseph Costanza Dep. [Doc. No. 90-38] at 60.

[55] March 25, 2009 Default Letter [Doc. No. 78-19].

[56] Joseph Costanza Dep. [Doc. No. 90-38] at 97 (Costanza, the president of SNB at the time, explained that making deposits of Sterling's collateral into an account with a different bank was a "mortal sin" and was "in and of itself a good enough reason to stop funding the credit line.").

[57] April 7, 2008 Letter [Doc. No. 78-7] at 3.

additional debt, needed to continue and in most likelihood shortly default on its debt," and that its efforts to cut its expenses "are not sufficient for [NMI] to survive" in the face of the "draconian changes brought about by the DRA."[58] Plaintiffs did not attempt to explain or support this purported injury in their briefing. Indeed, Plaintiffs' brief in opposition to summary judgment rests largely on their argument that involuntary bankruptcy petitions are *per se* damaging, which is not what the law requires.[59]

Thus, considering that lack of support in the record for the injuries of which Plaintiffs complain, in combination with the overwhelming evidence that NMI was closing due to forces and decisions independent of the involuntary bankruptcy petitions, there is no genuine dispute of material facts relating to whether Defendants' actions proximately caused injury to NMI.

### 2. Punitive Damages

Punitive damages may be awarded whether or not there is proof of actual damages.[60] "The purposes for assessing punitive damages are to punish the wrongdoer, to deter him from repeating his misdeeds, and to set an example so that others will be dissuaded from engaging in such conduct."[61] In assessing whether to grant punitive damages, courts consider "the degree and nature of the wrong to the debtor, the intent of the creditors, and any surrounding aggravating or mitigating circumstances."[62] [T]he most important indicium of the reasonableness of a punitive

---

[58] April 9, 2008 Email from Maury Rosenberg, [Doc. No. 78-25] at 2.

[59] *See, e.g., In re Atlas Mach. And Iron Works, Inc.*, 190 B.R. 796, 804 (Bankr. E.D. Va. 1995) ("Atlas failed to proffer any evidence indicating that its loss in business during and after the filing was caused by the actions of Bethlehem. Moreover, argument by counsel about the stigma of bankruptcy is not evidence of any damage proximately caused to Atlas's ongoing business reputation. Consequently, any additional loss of business following the filing of the petition is purely speculative and therefore, is not compensable.").

[60] *In re S. Cal. Sunbelt Developers, Inc.*, 608 F.3d 456, 465 (9th Cir. 2010) ("Section 303(i)(2) expressly authorizes a stand alone award of punitive damages.").

[61] *In re K.P. Enter.*, 135 B.R. 174, 183 (Bankr. D. Me. 1992).

[62] *In re Anmuth Holdings LLC*, 600 B.R. 168, 202-03 (Bankr. E.D.N.Y. 2019).

damages award is the degree of reprehensibility of the defendant's conduct,"[63] and punitive damages may be appropriate where the defendants' conduct is malicious or vengeful.[64] Punitive damages require more than bad faith, and "are only warranted when the evidence shows that a defendant acted 'with intentional malice' or that its conduct was 'particularly egregious.'"[65]

Here, the Court finds limited indicia of bad faith by Defendants. There is, for example, some evidence that Defendants were negligent and hasty in their filing of the involuntary bankruptcy petition as to NMI. However, Plaintiffs have not produced evidence of maliciousness or the type of egregious conduct that would warrant an award of punitive damages.

In evaluating whether an involuntary bankruptcy petition was filed in bad faith, the Third Circuit in *In re Forever Green Athletic Fields, Inc.* adopted a "totality of the circumstances" standard, which is a "fact-intensive review" pursuant to which a court may consider a number of factors, including: whether the creditors satisfied the statutory criteria for filing the petition, whether the creditors made a reasonable inquiry into the relevant facts and law before filing,

---

[63] *BMW of N. Am. Inc. v. Gore*, 517 U.S. 559, 575 (1996).

[64] *See In re Anmuth Holdings LLC*, 600 B.R. 168, 203 (Bankr. E.D.N.Y. 2019) (awarding punitive damages where petitioners' "actions reveal that they were motivated by malice and ill will," and acted vindictively); *Rosenberg v. DVI Receivables, XIV, LLC*, 2014 WL 4810348, at *9 (S.D. Fla. 2014) ("When viewed in the light most favorable to Plaintiff, the evidence is wholly lacking to support a finding of egregious or malicious conduct, such that the law would permit the imposition of punitive damages. Accordingly, the punitive damages award is set aside as a matter of law."); *In re K.P. Enterprise*, 135 B.R. at 184 (finding punitive damages not merited where, "although misguided and recalcitrant, [the defendant's conduct] was not malicious or vengeful," and the policy at work in § 303(i) would not be advanced by awarding punitive damages); *In re John Richards Homes Bldg. Co., LLC*, 312 B.R. 849, 866 (Bankr. E.D. Mich. 2004) (awarding punitive damages because of the petitioning creditor's "use of the involuntary bankruptcy process to intentionally inflict injury as well as his actions to exacerbate the impact of this injury (e.g., hiring the public relations firm to publicize the involuntary petition)"); *Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005) ("[P]unitive damages are appropriate for torts sounding in negligence when the conduct goes beyond mere negligence and into the realm of behavior which is willful, malicious or so careless as to indicate wanton disregard for the rights of the parties injured.").

[65] *U.S. Bank, Nat'l Ass'n v. Rosenberg*, 741 F. App'x 887, 890 (3d Cir. 2018) (citing *Rosenberg v. DVI Receivables, XIV, LLC*, 2014 WL 4810348, at *6); *see also In re K.P. Enter.*, 135 B.R. at 183 ("Section 303(i)(2) clearly provides for a discretionary punitive damages award, but imposition of punitive damages does not necessarily follow a bad faith finding.").

whether the filing was motivated by ill will or a desire to harass, whether the filing was used to gain a tactical advantage in pending actions, and whether the filing had suspicious timing.[66]

There is some conflicting evidence as to Defendants' level of diligence in inquiring into the facts and law before filing the involuntary bankruptcy petitions. The petitions were dismissed because Defendants failed to meet the numerosity requirement of § 303(b)(1) once the bankruptcy court determined that the DVI entities were not real parties in interest. In fact, on the petition date, the corporate good standing of the majority of the DVI entities had lapsed and had been administratively dissolved.[67] Fox, Brier, and Pinel admit that they did not do any investigation to determine the number or identity of the potential creditors of NMI,[68] and Pinel admitted that he did not do any investigation prior to the commencement of the involuntary bankruptcies as to the status of the creditors, and that "as it turns out," no one did; instead, Pinel "made an assumption" that someone had looked into this.[69] Pinel acknowledged that the filing of this petition was a "fast moving process" that "needed to be done quickly,"[70] as Maury Rosenberg had represented that NMI, who had been failing to pay its creditors, was on the brink of closing up entirely.[71] Given the extensive evidence that NMI was in serious financial distress,

---

[66] 804 F.3d 328, 336 (3d Cir. 2015).

[67] *In re Rosenberg*, 414 B.R. 826, 837 (Bankr. S.D. Fla. 2009).

[68] Brier asserted that he did not perform any due diligence before filing the petitions to determine "[e]xactly how many" creditors NMI and the Holding Company had. Brier Dep., Ex. 48 [Doc. No. 85-5] at 27. He also did not communicate with IBM or do any due diligence to determine if the creditors of the Holding Company were being paid in accordance to their terms. *Id.* at 28. Nor did he order a credit report of NMI or speak with any creditor of NMI or anyone from Sterling Bank or National Penn Bank prior to filing the involuntary. *Id.* at 42-43; Tr. Jury Trial, Ex. 49 [Doc. No. 85-5] at 22. Jane Fox asserted that she personally did not do anything to determine whether NMI had more than 12 creditors, and that no one at Lyon did any due diligence and that she did not know if anyone performed any due diligence on this issue. Dep. Jane Fox, Ex. 50 [Doc. No. 85-5] at 111–13. Pinel asserted that he did not do an investigation as to what a likely return to creditors may be, and he did not know who the creditors were, but "knew there was a number of creditors out there." Ex. 40 at 71, 80.

[69] Pinel Dep., Ex. 40 [Doc. No. 85-5] at 128.

[70] Pinel Dep., Ex. 40 [Doc. No. 85-5] at 75-76.

[71] Pinel Dep., Ex. 40 [Doc. No. 85-5] at 75-76.

the failure to adequately inquire into the facts and law, although certainly improper, does not rise to the level of maliciousness that would warrant punitive damages.

There is also conflicting evidence as to Defendants' ultimate goal, or purpose, for filing the petitions, which precludes summary judgment on the issue of bad faith. Pinel, Brier, and Fox have indicated that, in light of what they believed to be the imminent shutdown of NMI, the main purpose in filing the involuntary bankruptcy petitions was to appoint an interim trustee who could continue to operate the businesses.[72] Once the petitions were filed, Defendants never moved to have an interim trustee appointed. Fox asserted that she did not know why the request for an interim trustee was never made.[73] Brier stated that he asked for an interim trustee to be appointed "frequently," that he believed that Pinel would "take care of it," and that he realized no request had been made "shortly after the filing" of the petitions, because he "was still asking, how [to] get a trustee approved and appointed."[74] Pinel "disagree[d] with [Brier]'s testimony" on the matter, and asserted that the client, rather than Pinel, decided not to seek the appointment of a trustee[75] once it became apparent that there was no value in continuing the operations and that it would thus be more beneficial to wait for the involuntary petitions to be granted and for a Chapter 7 trustee to be appointed and to focus on orderly disposition of the assets.[76] Again, such

---

[72] In an email to Brier, Pinel stated that "[t]he only way" to prevent Maury Rosenberg from being able to close the NMI facilities would be to appoint an interim trustee, "who will take charge of the businesses." November 3, 2008, Email [Doc. No. 75-4] at 13. Pinel explained in his deposition that, appointing an interim trustee to keep the businesses in operation was "the primary reason" for filing the involuntary bankruptcy petitions, because "the value was in the operations, no question about that." Pinel Dep., Ex. 40 [Doc. No. 85-5], at 137. Brier similarly stated that his goal was "to get a trustee appointed as soon as possible." Brier Dep., Ex. 54 [Doc. No. 85-6] at 158. Fox, in her deposition, also stated that she "understood that the request [for interim trustee] was going to be made," that they wanted "to make sure that a trustee was put in place so that they could marshal the assets" of the closing NMI businesses." Fox Dep., Ex. 51 [Doc. No. 85-5] at 218-19.

[73] Fox Dep., Ex. 51 [Doc. No. 85-5] at 218.

[74] Brier Dep., Ex. 54 [Doc. No. 85-6] at 160-62.

[75] Pinel Dep., Ex. 40 [Doc. No. 85-5] at 156.

[76] *Id.* at 137.

evidence suggests, at most, a negligent and hasty approach to the involuntary bankruptcy petitions, but it does not evidence a "wanton disregard for the rights of the parties injured."[77]

Finally, there is some evidence in the record that Defendants filed these petitions, not solely in response to the impending closure of the NMI business and NMI's failure to pay its creditors,[78] but in order to gain a tactical advantage in the Bucks County action. One of the factors listed in *Forever Green* is "suspicious timing," and here, the involuntary bankruptcy petitions were filed a little over two months after the execution of the confessed judgment against Rosenberg was stayed in Bucks County,[79] and less than two months after Fox wrote in an email to Brier that he needed to make sure their attorney in the Bucks County action was a "street fighter" who needs to "out file Maurey [sic] and not sit back and let things just go through the court systems."[80] The involuntary petition was also filed soon after Defendants told Rosenberg that they would not accept anything other than a lump sum payment to satisfy his

---

Defendants argue that there is no material inconsistency in this testimony relating to the decisions not to request an interim trustee, as Fox and Brier, neither of whom is a lawyer, did not understand the difference between an interim trustee and a regular trustee, Defendants reasonably reconsidered the decision to seek the emergency relief of an interim trustee, and any inconsistencies in their recollection relate only to the "procedure" of how to meet the ultimate goal of preserving whatever value NMI had left. Defs.' Omnibus Reply in Supp. Summ. J. [Doc. No. 90] at 10-11. There does appear to be some merit to Defendants' position; Brier, for example, indicated that he wanted a trustee appointed "as soon as possible," not necessarily to continue operating the business, but, as Fox indicated, to "take control of the marshaling of the assets" and to "provide additional possible restructuring opportunities and provide transparency with regard to the multiple creditors that were involved." Brier Dep., Ex. 54 [Doc. No. 85-6] at 158. Yet, Defendants minimize the importance of these discussions surrounding the appointment of an interim trustee, which appears to have been a primary motivation for filing the involuntary petitions, and the Court cannot easily brush aside the confusion in the evidence and the conflicting testimony on this subject at the summary judgment stage.

[77] *Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005).

[78] On October 28, 2008, Brier wrote in an email to Jane Fox that Maury Rosenberg informed him that "all the Maryland centers were closed" and "that the rest of the centers will be closed in a matter of months if not sooner." October 28, 2008 email from Brier to Jane Fox, Ex. 39 [Doc. No. 85-4].

Defendants contend that it was only after they learned that Rosenberg intended to close all centers that Robert Pinel, U.S. Bank's outside counsel, advised that the best strategy to preserve NMI's value was to put it into bankruptcy so that a trustee could be appointed. Defs.' Omnibus Reply in Supp. Summ. J. [Doc. No. 90] at 7.

[79] The stay occurred on August 29, 2008, and the petitions were filed on November 7, 2008.

[80] Email, Sept. 18, 2008, Ex. 26 [Doc. No. 85-4].

outstanding debt, and the parties dispute whether Defendants were negotiating a restructuring of the debt in good faith.[81] The Court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion,"[82] and therefore the Court will not determine, at this stage, whether the Defendants improperly used the involuntary bankruptcy petition as a means to collect a debt.

Nevertheless, this potentially suspicious timing does not warrant an imposition of punitive damages. It is important to note the full context—this was also the same time that Maury Rosenberg had informed Fox and Brier that he was in the process of closing all of the NMI centers.[83] Upon receipt of this news, Brier informed Fox in an October 28, 2008 email that "an involuntary bankruptcy … now seems to be our best choice," given Maury Rosenberg's indication that the NMI centers will be closed "in a matter of months if not sooner," and that Maury Rosenberg "declined" to meet with a potential inquirer and "said it was too late, that he was closing all the centers now and that NMI had nothing to sell."[84] Thus, the Defendants may

---

[81] The parties appear to agree on the factual background of the negotiations surrounding the restructuring of the debt, but disagree as to whether each parties' position in the negotiations was reasonable or made in good faith. NMI asserts that U.S. Bank "had no interest in negotiating a restructuring of NMI's debt or working with NMI to find a realistic solution," Pls.' Omnibus Mem. Opp. Summ. J. [Doc. No. 85] at 7, as evidenced by a May 13, 2008, email in which Brier told NMI's counsel that they planed on filing a confession of judgment "asap." Email from Brier, Ex.19 [Doc. No. 85-3]. According to Plaintiffs, NMI was still attempting to work out a restructuring agreement at this time, but U.S. Bank's demand of $12 million over six months was not realistic. *See* July 28, 2008 letter to Brier, Ex. 22 [Doc. No. 85-4] ("As you know, U.S. Bank's demand is impossible to meet.").

In response, Defendants contend that "it is not bad faith for a creditor to want to be paid," Defs.' Omnibus Reply in Supp. Summ. J. [Doc. No. 90] at 9, and NMI's proposals were unreasonable, as evidenced by NMI's "best offer" for restructuring its debt, which was: reducing monthly payments by 70%; reducing Maury Rosenberg's guaranty from $7.6 million to $1.5 million; and allowing NMI to retire the entire $12 million debt for $2.5 million. July 28, 2008 letter to Brier, Ex. 22 [Doc. No. 85-4]. Plaintiffs also contend that U.S. Bank's requirement of an all cash settlement was unreasonable, whereas U.S. Bank asserts that this was entirely appropriate, "[c]onsidering NMI's nearly perpetual state of default, and the fact that NMI had not met its obligations since 2003." Defs.' Omnibus Reply in Supp. Summ. J. [Doc. No. 90] at 9.

[82] *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

[83] According to Brier, is the very reason he pursued the involuntary bankruptcy case. Brier Dep., [Doc. No. 90-43] at 240.

[84] Email, Ex. A-17 [Doc. No. 90].

have "had an improper motive, albeit not necessarily based on ill will or malice,"[85] and given the

context in which these involuntary bankruptcy petitions were improperly filed—NMI's

uncontested dire financial situation and that Maury Rosenberg had repeatedly threatened to

abruptly cease operations—and with the absence of any evidence of maliciousness or ill will, the

Court does not find that the policy surrounding § 303(i)(2) would be aided by awarding punitive

damages. [86]

### 3. Additional Issues Raised by Various Defendants

Some Defendants raised additional arguments in support of summary judgment.

Although the Court has granted Defendants' motions based on Plaintiffs' failure to meet the

elements of 11 U.S.C. § 303(i)(2), the Court will address these alternative arguments briefly in

the interest of creating a complete record.

#### i. Ashland

Ashland argues that it can only be held liable for damages arising after August 24, 2009,

the date its request to join the involuntary bankruptcy proceedings was adjudicated. Ashland did

not file the original, or first amended petitions, but was instead substituted for DVI Funding in

the second amended petitions, which were filed on April 10, 2009. On May 13, 2009, NMI

moved to strike the second amended petitions, arguing that leave of court was required to

---

[85] *See, e.g., In re Schloss,* 262 B.R. 111, 116–17 (Bankr. M.D. Fla. 2000) (finding that "[i]t is clear that… the Petitioning Creditors had an improper motive, albeit not necessarily based on ill will or malice," and although this evidence may warrant compensatory damages, it "does not warrant the imposition of punitive damages," which is not appropriate "unless there is a showing that [the filing] was done with malice").

[86] The primary evidence as to Defendants' malicious intentions is Jane Fox's "out-file" email, in which she asks Brier to ensure that their attorney in the state court action is a "street fighter." Email, Sept. 18, 2008, Ex. 26 [Doc. No. 85-4]. This email is certainly relevant to the evaluation of Defendants' conduct in the time leading up to the filing of the petitions. However, as it concerns the Bucks County proceedings, not the involuntary petitions, and was sent more than a month before Brier informed Fox of Pinel's advice to file an involuntary bankruptcy petition, it does not demonstrate the level of egregiousness or maliciousness that would permit an award of punitive damages. *See* October 28, 2008 Email from Brier [Doc. No. 90-17] at 2.

substitute Ashland for DVI Funding, and the motion was denied on August 24, 2009. Thus, according to Ashland, it cannot be liable for damages that occurred prior to August 2009, as it was not formally added as a petitioner until that date.

The relevant statute holds that "any petitioner that filed [a] petition in bad faith" is liable for "any damages proximately caused by such filing."[87] The statute defines liability for compensatory damages by the harm caused by the petitions themselves, not by the individual petitioners. A plain reading of this statute does not suggest that Ashland's late entry would preclude it, as a matter of law, from liability for any harm that the petitions, of which it took part, caused to NMI.[88] Further, there are genuine disputes as to the degree of Ashland's involvement once it became formally involved and whether its involvement prolonged the involuntary bankruptcy proceedings. Thus, had the Court found it plausible that the involuntary petitions caused harm to NMI, there would not have been a basis for portioning the purported harm to NMI as a matter of law, in the manner Ashland presently requests.[89]

ii.    Fox

Fox has argued that she cannot be liable under § 303(i) because she was not a "petitioner," for purposes of the statute, as she signed the involuntary petitions on behalf of the DVI companies and not in her personal capacity. In support, Fox asserts that the only parts of the involuntary petitions listing her name were the boxes calling for the "Name & Mailing Address

---

[87] 11 U.S.C. § 303(i)(2).

[88] Ashland's argument in its brief is not entirely clear, but its position appears to be that its scope of liability should be determined by the date on which it became formally involved as a petitioner; it does not clearly argue that its liability should be limited based on the date on which the particular amended petition in which it participated was filed. Thus, the Court will not consider, at this time, whether the amendments to the petitions should limit Ashland's liability to those particular petitions in which it took part.

[89] A court does have the discretion, however, to "apportion liability according to petitioners' relative responsibility or culpability, or to deny an award against some or all petitioners, depending on the totality of the circumstances." *In re Maple-Whitworth, Inc.*, 556 F.3d 742, 746 (9th Cir. 2009).

of Individual Signing in Representative Capacity," and her name was not listed in the boxes calling for the "Name of Petitioner."

The Pennsylvania Bankruptcy Court addressed this very argument raised by Fox, and held that, "[u]nder Pennsylvania law, employees of a corporation are liable for their own misfeasance or negligent conduct, even if they were acting within the scope of their employment when they engaged in the conduct in question."[90] As the record contains evidence that Fox exercised considerable control over the filing of the involuntary bankruptcy petitions on behalf of the DVI Companies, this argument cannot be a basis for granting summary judgment as to Fox.[91]

### iii. DVI Entities

Finally, the DVI entities assert that the claims against them are barred by collateral estoppel and judicial estoppel. As to collateral estoppel, the DVI entities contend that the present

---

[90] *In re Nat'l Med. Imaging, LLC*, 570 B.R. 147, 159 (Bankr. E.D. Pa. 2017).

[91] There is some dispute among federal courts as to whether agency law is applicable to § 303(i), and this Court finds that § 303(i) implicitly incorporates the common law doctrine of agency liability. *See In re McMillan*, 614 F. App'x 206, 214 (5th Cir. 2015) (finding that § 303(i) may "incorporate[] the common law doctrine of agency holding that principals are liable for the authorized acts of their agents," and citing numerous other federal statutes that have done so) (Dennis, J. dissenting).

Plaintiffs cite to the bankruptcy court decision *In re McMillan*, as support for their position that theories of agency liability do not apply to § 303(i). 543 B.R. 808 (Bankr. N.D. Tex. 2016). In that case, the court distinguished § 303(i) from federal statutes that have been found to implicitly incorporate common law doctrines of agency liability, by vaguely determining that those statutes, such as the Fair Housing Act, are "tort-like," while the bankruptcy statute is not. *Id.* at 816. Additionally, that court determined that Congress did not intend for a debtor to be able to "circumvent" the rule by allowing third parties to "become 'petitioners' by virtue of state law concepts of agency and joint venture. *Id.* In so deciding, the court emphasized that the provisions in § 303 provide a "comprehensive remedial scheme that provides a full range of protections for the debtor," citing to *In re Miles*, a Ninth Circuit case where the court found that § 303(i) "completely preempts state law tort causes of action for damages predicated upon the filing of an involuntary petition." 430 F.3d 1083, 1086 (9th Cir. 2005).

However, the Third Circuit has specifically found *In re Miles* "not … persuasive on the preemption issue," and has held that "§ 303(i) is not an exclusive remedy for debtors who convert an involuntary Chapter 7 bankruptcy petition to a voluntary Chapter 11 reorganization." *Rosenberg v. DVI Receivables XVII, LLC*, 835 F.3d 414, 421 (3d Cir. 2016) (citation omitted); *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 393 (3d Cir. 2002) ("Despite the broad scope of remedies available in the Code and the general exclusivity of the federal courts in bankruptcy, we have held that a state claim for malicious abuse of process was not preempted."). Thus, this Court declines to follow the reasoning in *In re McMillan*, and finds that common law theories of agency liability are appropriate in this case.

litigation against them is precluded by the decision in the Florida bankruptcy case, in which the court determined that the DVI entities lacked standing to file an involuntary bankruptcy petition against Maury Rosenberg, because no guaranty was executed by Maury Rosenberg in their favor and they were thus not "real parties in interest"; instead, they were "nothing more than pass-through entities to facilitate the securitization transactions. No actual injury can be traced to these entities, which could potentially be redressed by the bankruptcy estate."[92] However, the question at issue in that case—whether the DVI entities were parties in interest with standing to file the involuntary bankruptcy petitions under § 303(b)—differs from the issue of their potential liability under § 303(i)(2) in this action. Thus, as the present issue was not "actually litigated in the prior action," the elements of collateral estoppel are not met.[93]

Nor would judicial estoppel warrant dismissal of the case as to the DVI entities. Judicial estoppel allows federal courts to sanction malfeasance by barring a litigant from "asserting a position that is inconsistent with one he or she previously took before a court or agency."[94] "The basic principle" of judicial estoppel is that "absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory."[95] The DVI entities argue that counsel for Maury Rosenberg (with whom NMI is in privity) "vigorously argued" in Florida that Fox and U.S. Bank had no right to file the petitions for the DVI entities, who played no real role in filing the involuntary

---

[92] *In re Rosenberg*, 414 B.R. 826, 842 (Bankr. S.D. Fla. 2009).

[93] "[T]he prerequisites for the application of issue preclusion are satisfied when: (1) the issue sought to be precluded [is] the same as that involved in the prior action, (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment." *Nat'l R.R. Passenger Corp. v. Pa. Public Utility Com'n*, 288 F.3d 519, 525 (3d Cir. 2002) (internal quotations and citation omitted).

[94] *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779 (3d Cir. 2001).

[95] *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996) (quoting 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4477 (1981), at 782).

petition. Specifically, during the hearing on Maury Rosenberg's motion to dismiss the involuntary bankruptcy petitions in the Southern District of Florida, Rosenberg's counsel argued that Fox "signed for DVI Funding, knowing all the time that DVI Funding didn't own the alleged assets," that Fox's authority came only from U.S. Bank, not the DVI entities, that U.S. Bank had "no authority to take any action" on behalf of the DVI entities, and that Fox "gerrymandered" the signature block to make it look like she was a representative of the DVI entities, when in reality, she was a representative of U.S. Bank.[96] The DVI entities contend that these arguments cannot be reconciled with NMI's present claims that the DVI entities filed the involuntary petitions in bad faith.

In response, Plaintiffs contend that these arguments were made "before all relevant facts as to Fox's authority had been disclosed—namely the power of authority Lyon held to act on behalf of the DVI companies had not been produced, never came into evidence in the in the Rosenberg bankruptcy case, and was never considered by the Florida Bankruptcy Court," and, "[n]ow that all the relevant facts have been disclosed, NMI does not dispute that [U.S. Bank] had authority to act on behalf of the DVI Companies."[97] Judicial estoppel should only be used where a party's position is "tantamount to a knowing misrepresentation to or even fraud on the court,"[98] and at this time, Plaintiffs' explanation for its inconsistent position would preclude dismissal of its claim against DVI entities based on judicial estoppel.

## IV.    CONCLUSION

For the reasons stated above, the Court will grant Defendants' motion for summary judgment. As no claims remain against Defendants, U.S. Bank's motion for default judgment on

---

[96] Transcript of April 20, 2008 Hearing, Ex. A [Doc. No. 80] at 19-20, 23.

[97] Pls.' Omnibus Mem. in Opp. Summ. J. [Doc. No. 85] at 45-46.

[98] *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. GMC*, 337 F.3d 314, 324 (3d Cir. 2003).

its counterclaim asserting entitlement to set off its prior judgments against any amounts found to be due to Plaintiffs in this action will be dismissed as moot. An appropriate order follows.